UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.                                 10-CR-300-A
                                           **DECISION AND ORDER**

ROBERT E. BASCHMANN, JR.,

                   Defendant.
_____

       The defendant in this case, Robert E. Baschmann, Jr., suffers from a delusional disorder leaving him unable to understand the nature and consequences of the criminal proceedings against him and to assist properly in his defense. As a result, pursuant to 18 U.S.C. § 4241(d) and *Dusky v. United States*, 362 U.S. 402 (1960), the Court has found defendant Baschmann mentally incompetent to stand for trial and ordered the defendant committed to the custody of the Federal Bureau of Prisons for mental health treatment and to determine whether there is a substantial probability in the foreseeable future that he can be restored to competency. However, the defendant does not believe himself incompetent, and he refuses treatment that may restore him to competency.

       Presently before the Court is the United States' motion, pursuant to 18 U.S.C. § 4241(d), and the four-part test stated by the Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003), to forcibly medicate the defendant to restore him to mental competency for trial. On May 30, 2014 and June 23, 2014, the Court held an evidentiary hearing to consider, in light of the § 4241(d) factors announced in *Sell*, whether defendant Baschmann should be forcibly medicated.

For the reasons that follow, upon consideration of the evidence and testimony received during the *Sell* hearing, and pursuant to § 4241(d), the Court grants the United States' motion to forcibly medicate the defendant potentially for a period of four months.

## BACKGROUND

Defendant Baschmann is accused of a mortgage loan advance-fee scheme in an Indictment charging three counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of wire fraud in violation of 18 U.S.C. § 1343.  The defendant is alleged to have defrauded more than 100 victims of more than $1,000,000.

On December 6, 2012, defendant Baschmann appeared before the Court to enter into an plea agreement and to plead guilty.  During the plea proceeding, the Court became concerned about the defendant's mental state, and adjourned entry of the change of plea.

At defendant Baschmann's next appearance on January 14, 2013, his counsel reported a serious breakdown in communication with the defendant.  After colloquy regarding the issue, the Court scheduled a status conference for approximately one month later.

In early February 2013, defendant Baschmann's counsel made an unopposed motion requesting that the Court order the defendant to undergo a mental competency exam.  Pursuant to 18 U.S.C. § 4241(a) and (b), the Court granted the motion, and after receiving a report of an examination of the defendant

by Dr. Ana Natasha Cervantes, M.D., the Court granted defense counsel's

supplemental motion, made at the request by Dr. Cervantes, that the defendant

undergo psychological testing by Dr. Daniel Antonius, Ph.D.

Both Dr. Cervantes and Dr. Antonius diagnosed defendant Baschmann as

suffering from a delusional disorder, mixed type.  The defendant suffers from

mixed grandiose and persecutory delusions.  Both Dr. Cervantes and Dr. Antonius

opined the defendant lacks the ability to assist properly in his defense and that he

is mentally incompetent to stand for trial.  *See* Gov't Ex. 1 at 5; Gov't Ex. 3503.[1]

Upon review of the reports and opinions of Dr. Cervantes and Dr. Antonius,

the Court found pursuant to 18 U.S.C. § 4241(d), by a preponderance of the

evidence, that the defendant is mentally incompetent to stand for trial.  The Court

ordered that the defendant be committed to a suitable facility at which he could be

further examined and potentially treated.  *See* Min. Entry for May 30, 2013, Dkt.

No. 82.

Defendant Baschmann was admitted to the Federal Medical Center at

Butner, North Carolina (FMC Butner) in October, 2013.  *See* Gov't Ex. 1 at 1.

After examining the defendant at FMC Butner for approximately two-and-a-half

months, Dr. Robert Lucking, M.D., and Dr. Angela Walden Weaver, Ph.D.

—respectively, a staff psychiatrist and a staff psychologist at FMC

Butner—submitted a report summarizing their evaluation of the defendant.  *See*

---

[1]  Citations to "Gov't Ex. _" are to exhibits used during the *Sell* hearing.

Gov't Ex. 1.  The report concluded that the defendant suffers a delusional disorder, mixed type, and is not competent for trial.  *See* Gov't Ex. 1 at 10.  The report also noted, however, that the defendant does not believe he suffers from delusions, or a mental disorder requiring treatment, and that he refuses treatment that would likely restore him to competency.  *Id.* at 12.

## DISCUSSION

Based on the Court's finding that defendant Baschmann is mentally incompetent to stand for trial because of his delusional disorder, mixed type, and on the defendant's refusal of potentially restorative treatment, the United States has moved pursuant to 18 U.S.C. § 4241(d) that the Court authorize mental health professionals at FMC Butner to forcibly medicate the defendant in accordance with a detailed treatment plan, to attempt to restore him to competency for trial.

### <u>Forced Medication to Restore Competency</u>

Forcibly medicating a pre-trial defendant who does not pose a danger to himself or the public raises grave due process concerns.  *See Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.")  Nevertheless, in a line of cases ending with *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court has recognized that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant."  *Id.* at 179.

4

To comport with the constitutional guarantee of due process, the Court in
*Sell* required that courts make a series of findings and conclusions prior to
ordering that a defendant be forcibly medicated.  Thus, to order forcible
medication of a pre-trial defendant who is "facing serious criminal charges," the
United States must prove that "the treatment is medically appropriate, is
substantially unlikely to have side effects that may undermine the fairness of the
trial, and, taking account of less intrusive alternatives, is necessary significantly to
further important governmental trial-related interests."  *Id.*  These so-called *Sell*
factors, which the Court indicated would likely be satisfied only in "rare" instances,
*id.* at 180, did not come with a standard of proof.  In *United States v. Gomes*, 387
F.3d 157 (2d Cir. 2004), the Second Circuit concluded, based on pre-*Sell*
involuntary medication case law, that  "the relevant findings [under *Sell*] must be
supported by clear and convincing evidence."  *Id.* at 160.

On May 30, 2014, the Court held a day-long evidentiary hearing, followed
by a brief continuation on June 23, 2014.  Three witnesses testified at the hearing.
The Court found each witness to be qualified and credible.

The United States' first witness, Margaret Podkova, is a doctoral intern at
FMC Butner, and is completing a rotation, half of which was spent in the general
population and half of which was spent in clinical psychology.  HT 4.[2]  Ms.
Podkova earned a master's degree in forensic psychology from the John Jay

---

[2]  Citations to "HT __" are to pages of the *Sell* hearing transcript.

College of Criminal Justice in 2003, is currently enrolled at Antioch University and, upon completion of her work at FMC Butner, is expected to receive her doctoral degree in clinical psychology in September 2014. *Id.* at 5-6. Ms. Podkova met with defendant Baschmann approximately eighteen times at FMC Butner and drafted the portions of the Bureau of Prisons report relating to the defendant's history, diagnoses, summary of previous psychological testing, impression, and opinion regarding competency. *Id.* at 7-8. Ms. Podkova is supervised by Dr. Angela Walden Weaver, Ph.D., a staff psychologist at FMC Butner. *Id.* at 7.

The United States' second witness, Dr. Robert G. Lucking, M.D., was board certified in psychiatry in 1982 and has been a staff psychiatrist at FMC Butner since 1998. Prior to his employment at FMC Butner, Dr. Lucking was a staff psychiatrist at multiple FMC facilities. *Id.* at 39; Gov't Exh. 3502.

The final witness during the *Sell* hearing, Dr. Ana Natasha Cervantes, M.D., is also board certified in psychiatry and testified as defendant Baschmann's witness in opposition to the motion for forcible mediation. Dr. Cervantes is a forensic psychiatrist who authored the first report as to the defendant's competency received by the Court. *See* Dkt. No. 90-1; Gov't Ex. 3503. Dr. Cervantes has been in private practice as a forensic psychiatrist since 2006, and has been a forensic evaluator for Erie County Mental Health Services since 2009. *Id.* Dr. Cervantes has also taught in the field of psychiatry since 2008. *Id.*

## The Defendant's Delusional Disorder

It is undisputed that defendant Baschmann suffers from delusional disorder, mixed type, which renders him mentally incompetent to stand for trial.  As stated by the United States' primary expert, Dr. Lucking, the condition is a "biological illness requiring a biological treatment."  HT 58.  In general, Dr. Lucking testified, "[a] delusion is a fixed false belief which is unrealistic.  There is no evidence to support [the belief] and [it] is held with significant intensity, despite evidence to the contrary and it alters the reality of the person who is experiencing it."  HT 44. *Accord id.* 153 (testimony of Dr. Cervantes) ("[D]elusional disorder, in general, is a psychiatric illness that is characterized by delusions or fixed false beliefs that are not based in reality.")  According to Dr. Lucking, individuals with delusional disorder "almost always function well in the community.  They have no difficulty functioning in terms of work, relationships, school, [or] job and they can function for quite some time in those areas; as long as it does not involve their delusion. So, you can meet an individual with delusional disorder on the street and have a conversation with him and as long as you don't touch upon the delusional ideas, you wouldn't know that he was ill."  *Id.* 44-45.

Delusional disorder can present itself in multiple forms, each of which relates to the nature of the individual's false beliefs.  An individual with "mixed" delusional disorder, such as defendant Baschmann, suffers from multiple forms of delusional disorder.  *See id.* 12 (noting that "mixed type" "means that the delusions

7

are not specific to one area").  Each of the witnesses agreed that the defendant's

"mixed" delusional disorder is the result of two types of delusions from which the

defendant suffers:  (1) grandiose delusions; and (2) persecutory delusions.  *See*

*id.* 12 ("[The defendant], for example, presented with delusions that were both

grandiose in nature and persecutory in nature.")

Defendant Baschmann's grandiose delusions likely pre-date the criminal

case against him and, generally speaking, are fixed-false beliefs that are

characterized by  "delusions of inflated worth, power, knowledge, identity, or

special relationship to a deity or famous person."  Gov't Ex. 3503 at 12 (Dr.

Cervantes' report).  Examples of the defendant's grandiose delusions, recounted

in the FMC Butner report, include the following:

> [The defendant] reported he received the support of many
> influential people in organizing his project.  For example,
> Senator  Barbara  Boxer  from  California,  Governor
> Schwarzenegger, Benjamin Brooks (a dignitary in Seattle),
> and  Brigadier  General  Michael  D.  Stratton  support  his
> plans.   In addition, he reported he was "chosen" to work
> with  INTERPOL  and  they  will  provide  his  legal  defense.
> According to [the Defendant], an INTERPOL agent and two
> attorneys (one from England and one from Australia) have
> been working on dismissing the case against him and have
> offered him a deal he will take.  When asked how he came
> to  know  these  individuals  he  was  guarded  and  provided
> vague answers, such as "we did business together."

Gov't Ex. 1 at 10.

As Dr. Cervantes noted in her report, persecutory delusions are generally

characterized as "delusions that the person (or someone to whom the person is

close) is being malevolently treated in some way."  Gov't Ex. 3503 at 12.  Dr.

Cervantes opined that, unlike his grandiose delusions, defendant Baschmann's

persecutory delusions  "started after the investigation by the government and

related primarily to being followed, monitored or intruded upon by various

government officials but, again, related to the investigation that the government

was actually undertaking."  HT 160.  Examples of the defendant's persecutory

beliefs include the following:

> [The defendant] believed his younger sister was the reason
> he was charged with the alleged crime.  According to him,
> his sister started working for [U.S. Attorney for the Western
> District of New York William] Hochul, she provided [U.S.
> Attorney Hochul] with documents and 250 million dollars in
> "Pentagon bonds" she stole from [the defendant].
> According to him, the judge [presumably the undersigned]
> attempted to "throw the case out" but his attorney and U.S.
> Attorney Hochul prevented this from occurring.   On
> numerous occasions, when he provided his attorney with
> contact information for possible witnesses, the U.S.
> [A]ttorney's office called and threatened the witnesses,
> discouraging them from giving testimony on [the
> defendant's] behalf.  In addition, the U.S. [A]ttorney's office
> was tampering with his mail (i.e., intercepting complaints to
> the House Oversight Committee) and erased his social
> security number.

*Id.*  Similarly, many of the defendant's persecutory delusions involved his belief

that his first attorney in the case, Mr. Tracy Hayes, was actively working against

him.  For example:

> [The defendant] believed Tracy Hayes was his conservator
> and, as such, had unlimited power to make decisions about
> [the defendant's] life.  According to [the defendant], Mr.
> Hayes worked with the prosecution and, against the

judge's opinion, arranged for charges to be brought against him.   Numerous attorneys from prestigious law firms around the U.S. reportedly looked at his case and agreed it should be dismissed, but Mr. Hayes contacted these attorneys and threatened them not to get involved. Therefore, [the defendant] hired two attorneys from overseas and one Interpol agent to work on removing Mr. Hayes from his case.  [The defendant] reported this was done through his family in order to prevent Mr. Hayes' interference.  At the time this report was submitted, [the defendant] believed he had $2,000,000 (he would not disclose the source of this money) for his new legal team and that they would initiate the process of removing [the defendant] from FMC Butner within a week.

*Id.* at 11.  Based on the their analyses, Dr. Lucking, the United States witness during the *Sell* hearing, and Dr. Cervantes, the defendant's witness, opined in their pre-hearing reports that the defendant's delusional disorder, mixed type, prohibits him from "understand[ing] the nature and consequences of the proceedings against him and to assist in his defense."  Gov't Ex. 1 at 10 (Dr. Lucking's report). *Accord* Gov't Ex. 3503 at 11-14 (Dr. Cervantes' Report).

Based on these uncontested diagnoses and opinions, the Court found by a preponderance of the evidence that defendant Baschmann suffers from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  18 U.S.C. § 4241(d).  Having been lawfully committed to FMC Butner for possible treatment upon the Court's finding, however, the defendant disagrees that he suffers from a mental competency issue and refuses treatment.

10

**The Four *Sell* Factors**

Upon the United States' motion pursuant to 18 U.S. C. § 4241(d) to forcibly medicate defendant Baschmann, the Court addresses each *Sell* factor in turn:

**A.  The Government's Interest in Trying The Defendant.**  *Sell* first requires that there be  "*important* governmental interests at stake" before a Court orders that a pre-trial defendant be forcibly medicated.  *Sell*, 539 U.S. at 180 (emphasis in original).  According to *Sell*, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important."  *Id.*  Although this factor is ultimately a question of law, *see Gomes*, 387 F.3d at 160, assessment of the factor must still take account of the particular facts of a  defendant's case.  *See Sell*, 539 U.S. at 181 ("Courts . . . must consider the facts of the individual case in evaluation the Government's interest in prosecution.")

As an abstract question, the United States unquestionably has an "important"  interest in bringing to trial a defendant alleged to have orchestrated an advance-fee mortgage fraud scheme with losses of over $1 million from more than 100 victims.  To make a better and more realistic determination whether the United States' interest is important in this context, the Second Circuit in *Gomes* endorsed an analysis that first considers the defendant's potential sentence for the charged crimes as a rough proxy for the importance of the United States' interests. *See Gomes,* 387 F.3d at 160 ("Both the seriousness of the crime and Gomes's perceived dangerousness to society are evident from the substantial sentence

Gomes faces if convicted.") (quoting *United States v. Gomes*, 289 F.3d 71, 86 (2d Cir. 2002) ("*Gomes I*")).  Following *Sell*'s lead, the Second Circuit then suggested that district courts consider "whether the potential for civil commitment abates the Government's interest in prosecuting the [defendant]."

Accordingly, other district courts in this Circuit have followed this approach to determine the relative importance of the United States' interest in obtaining a *Sell* involuntary-medication order.  For example, in *United States v. Weinberg*, 743 F. Supp. 2d 234 (W.D.N.Y. 2010), the court found that the first *Sell* factor "tip[ped] decidedly in [the defendant's] favor."  *Id.* at 237.  Based on the United States analysis of the defendant's potential sentence for the charged crimes, the court noted that, given the amount of time that would elapse until the defendant's competency was restored, together with the amount of additional time that would elapse before trial, the defendant could potentially "be[] incarcerated at least three times longer than the Guideline range suggested for th[e] offense, and possibly closer to the [charged crime's] statutory maximum."  *Id.* at 238.  *See also United States v. Feretti*, No. 08-m-51 (GLS/DRH), 2009 WL 4730227, at *4 (N.D.N.Y. Dec. 2, 2009) (finding that the first *Sell* factor favored the defendant where "it appears probable that [the defendant] has now been incarcerated for a period longer than any likely sentence and approaching the maximum sentence she would likely receive").

In this case, there is an  "important governmental interest" that could

support an order to involuntarily medicate defendant Baschmann.  The United States has charged the defendant with a relatively extensive mortgage fraud scheme against more that 100 victims and total potential losses of more than $1 million.  It is alleged defendant Baschmann fraudulently received advance fee payments from more than 120 persons.  He set up accounts at the Bank of China, in New York City, as a repository for these funds.  He claimed to be using the advance fees in a complex, sophisticated investment program, when, instead, he did not invest the money at all.  He set up a corporation to give credibility to the scheme.  And he used a well-known title company to lend apparent credibility to the scheme.

Defendant Baschmann faces potentially consecutive statutory maximum penalties of a total of 80 years imprisonment for the four charged executions of the scheme to defraud.  *See* 18 U.S.C. §§ 1341 and 1343.  Under the Sentencing Guidelines, it appears the defendant would have an adjusted offense level pursuant to Guidelines § 2B1.1 of 25, and, since he has no qualifying criminal convictions, a criminal history category pursuant to § 4A1.1 of I.  The defendant therefore likely faces an advisory range of imprisonment under the Sentencing Guidelines of 57 to 71 months.

The Court finds this is a case where "the offense charged . . . constitutes a serious crime on its face."  *Feretti*, 2009 WL 4730227 at *4.  The offenses are not crimes that  "fall[] at the lower end of serious offenses."  *Id.* (finding that although it

is a serious offense, threatening to harm then-Senator Hillary Clinton  "falls at the lower end of serious offenses in the circumstances presented"); *Weinberg*, 743 F. Supp. 2d at 237 (noting that, while it is a serious charge, the charge of "threatening a judicial officer . . . seems quite consistent with [the defendant's] illness, schizophrenia with paranoid delusions.  The fact that [the defendant] publicized his ideation in such an open manner with copies to federal government officials and the FBI suggests that his actual intent to commit the act was delusional as well").  To the contrary, based upon the nature of the defendant's alleged conduct, and using the advisory Sentencing Guidelines range of imprisonment and statutory maximum imprisonment as proxies for the seriousness of the charged crimes, the Court finds clear and convincing objective indicia of the seriousness of the charged crimes and, therefore, the importance of the United States' interest in bringing defendant Baschmann to trial.  *See Gomes*, 387 F.3d at 159-61 (finding that one count of being a felon in possession of a firearm, which, due to prior convictions, carried a 15-year minimum penalty, was sufficiently serious to satisfy *Sell*).  The United States has thus "facially satisfied its burden" on the first *Sell*  "seriousness" factor.  *United States v. Decoteau ("Decoteau I")*, 857 F. Supp. 2d 295, 302-03 (E.D.N.Y. 2012).

Under *Sell*, the Court must next consider whether "certain circumstances 'may lessen the importance of [the United States'] interest.'"  *Gomes*, 387 F.3d at 160 (quoting *Sell*, 539 U.S. at 180).  The Court finds none.  This is not a case like

*Weinberg* or *Feretti*, noted above, in which the courts found that, to restore

defendants to competency, the defendants would likely need to be incarcerated for

a time period longer than the potential sentence for the charged crimes.  *See also*

*Sell*, 539 U.S. at 180 ("The potential for future confinement affects, but does not

totally undermine, the strength of the need for prosecution.")  Here, however,

defendant Baschmann is not currently in pretrial custody and he has spent

approximately four months in custody.  The United States has requested that the

Court permit FMC Butner to involuntarily medicate the defendant for a period of up

to four months, the maximum period permitted by 18 U.S.C. § 4241(d).

Dr. Lucking testified that, in his opinion, it would take the entire requested

four-month period to restore defendant Baschmann to competency.  HT 141.  Dr.

Lucking then testified that if the defendant were not successfully restored after the

initial four-month period, Dr. Lucking would likely request that the Court grant an

additional four-month period of forcible medication.  *Id.*  If the defendant were not

restored to competency after a second four-month period, Dr. Lucking testified that

he would likely then "throw in the towel."  *Id.*  In addition, Dr. Lucking testified that

if the defendant is successfully restored to competency after the initial four-month

period, the defendant would need to stay on medication to prevent his symptoms

from "reoccurr[ing] fairly rapidly."  *Id.* 66.  According to Dr. Lucking, if the

defendant is restored to competency, it would be best for the defendant to remain

in custody at FMC Butner to continue receiving forced injections until trial and, if

trial resulted in a conviction, through sentencing.  *Id.* 143.

Therefore, if defendant Baschmann were to be successfully restored to competency during the initial four-month period, unless he began voluntarily taking medication, he would likely need to be incarcerated through trial and, if necessary, through sentencing.  Although it is, of course, impossible to predict such events with certainty, it is likely that following the defendant's restoration to competency, it could take up to another six months for the parties to attempt to reach a plea agreement or, in the alternative, proceed to jury selection and trial.  If the defendant were then convicted, it could potentially take another four months until he were sentenced.

Thus, assuming that the United States' proposed forcible-medication regime is successful, defendant Baschmann could be required to be in custody, at the high end, for approximately fourteen months, *i.e.*, the initial four-month period to restore competency and an additional ten-month period for trial and possible sentencing.  However, this period of time is far shorter than the defendant's potential sentence or advisory sentence for the charged crimes.  Thus, the United States interest in prosecuting the defendant is not greatly undermined by the length of his potential pre-trial incarceration for potential treatment.

Finally, the Second Circuit recommends that in assessing the first *Sell* factor, courts  "consider whether the potential for civil commitment abates the Government's interest in prosecuting" the defendant.  *Gomes*, 387 F.3d at 161.

16

However, like the defendant in *Gomes*, "in this case, [the Court] need not consider how the potential for civil commitment impacts this case"  because "[t]here is little, if any, evidence on the record to suggest that [defendant Baschmann] would qualify for civil commitment."  *Id.*  Specifically, there was no evidence adduced at the hearing to suggest that the defendant poses a physical threat to himself or others.  Accordingly, the Court concludes, as in *Gomes*, that "[t]he prospect of civil commitment is insufficient to undermine the Government's interest in bringing the [defendant] to trial."  *Id.*

Thus, for the foregoing reasons, the Court finds, by clear and convincing evidence, that the United States has a sufficiently important interest in prosecuting this case against defendant Baschmann to satisfy the first *Sell* factor.

**B.  The Likelihood of Fair Restoration to Competence.**  *Sell* next requires the Court to determine (1) whether "administration of the drugs is substantially likely to render the defendant competent to stand trial" and (2) whether "that administration of the drugs is substantially *unlikely* to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair."  *Sell*, 539 U.S. at 180 (emphasis added).  The primary Second Circuit opinion on involuntary medication of a pre-trial defendant, *Gomes*, found that the second *Sell* factor's "substantial likelihood" test was satisfied where expert testimony demonstrated that "there [was] a 70 percent chance that [the defendant] could be rendered

competent through treatment with anti-psychotic medication." *Gomes*, 387 F.3d at 159.

> *Likelihood of Success.* At the hearing, Dr. Lucking testified that the United States' proposed medication would clear the threshold established by *Gomes*. According to Dr. Lucking, the "literature addressing the restoration of competency supports the fact that anywhere between 75 percent or 90 percent and 95 percent could be restored to competency with treatment." HT 51. When asked whether these success rates would apply to a person with delusional disorder, such as defendant Baschmann, Dr. Lucking testified that "again, delusional disorder is a psychotic symptom and most of these individuals who are restored to competency are psychotic. So, yes, I believe that there is a substantial probability that he could be restored." *Id.* 51. In addition to the relevant literature, which is discussed in his report, Dr. Lucking based his conclusion on a number of factors unique to the defendant.

> Among these factors is Dr. Lucking's opinion that defendant Baschmann exhibited a "higher level of functioning prior to the onset of psychosis," which correlates with a "higher level of functioning . . . after the treatment of the psychosis." *Id.* 53. In particular, Dr. Lucking's report stated, based on the defendant's largely self-reported history, that the defendant "exhibits a number of the characteristics associated with good outcome with antipsychotic medication treatment: 1) he has been married; 2) he had a higher level of premorbid

functioning; 3) there is no family history of schizophrenia; 4) there is no evidence of organic brain impairment; 5) he has an older age of onset; 6) he exhibits predominantly positive symptoms (delusions) which respond more readily to treatment with antipsychotic medication; [and] 7) there is the absence of negative symptoms."  Gov't Ex. 1 at 13.  The report then identifies three factors "associated with poor outcome with antipsychotic medication treatment," which the defendant also exhibits: "1) insidious onset; 2) being male; [and] 3) longer period of duration of untreated psychosis."  *Id.*

At the hearing, defendant Baschmann attempted to show, by way of cross-examining Dr. Lucking and through Dr. Cervantes' direct examination, that several of the positive factors listed above are of questionable reliability.  For example, during cross-examination, Dr. Lucking was asked about "the source of the information about [the defendant's] employment."  HT 86.  This question was presumably triggered by the defendant reporting that he had been "employed in '84 and he reported he drove trucks," but that he also "talked about working for various government agencies such as the NSA."  *Id.* 88.  Similarly, Dr. Lucking was asked on cross-examination whether the defendant's first marriage, which ended in divorce after seven months in 1994, and a subsequent eight-month relationship in the 2000s, were sufficient to suggest that the defendant has had stable relationships that might demonstrate a higher level of functioning and, therefore, a higher likelihood of treatment success.  HT 80-81.  Finally, Dr.

19

Cervantes testified that she questioned  Dr. Lucking's conclusions because the defendant's lack of history of past psychiatric treatment shows that  "we have no history of whether he's responsive to anti-psychotic medications."  *Id.* 159.

Dr. Cervantes further testified that "the duration of [defendant Baschmann's symptoms appears to be quite long and again, untreated for probably a decade or possibly even more," which means that "it's more difficult to treat."  *Id.* 159.  Based on these and several other critiques of Dr. Lucking's report, Dr. Cervantes testified that, in her opinion, "the success rate for [the defendant] is probably closer to 50 percent, at best."  *Id.* 163.

The Court has carefully considered defendant Baschmann's arguments in this regard, but after reviewing and evaluating the evidence as a whole, the Court nonetheless finds by clear and convincing evidence that the United States' proposed medication is substantially likely to succeed in restoring the defendant to competency.  *See Sell*, 539 U.S. at 180; *Gomes*, 387 F.3d at 159.  The Court reaches this conclusion for several reasons.

First, as Dr. Lucking testified, the "higher the level of functioning prior to the onset of psychosis, the higher level of functioning you are likely to have after the treatment of psychosis."  HT 53.  Although the Court acknowledges and has considered the concerns raised during Dr. Lucking's cross-examination and Dr. Cervantes' direct testimony, the evidence received at the hearing shows that these factors are only *some* indicia that evidence a patient's level of functioning.  For

example, Dr. Lucking testified that functioning can be measured in other ways as well, as when he noted that the defendant is "quite high functioning in the sense that he's [allegedly] able to get people to give him their money," which "says something about his level of functioning and his level of organization." *Id.* 92. Similarly, Dr. Lucking testified that, taking a more holistic approach, the defendant's "good outcome factors . . . are significantly more and the outweigh the bad outcome factors." *Id.* 56. *See also id.* 56 ("Again, he has the majority of positive factors to respond to medication. So I think that contributes to the substantial probability that he could be restored.")

Second, Dr. Lucking identified a number of other factors, not necessarily associated with defendant Baschmann's level of functioning, but which are associated with a higher likelihood of success after medication. For example, Dr. Lucking testified that "[t]here are other factors that also go into this; not having a family history of schizophrenia, not having any [of] what we call organic impairment or organic brain diagnosis, [and] having older age of onset." *Id.* 53. According to Dr. Lucking, the defendant does not have a genetic predisposition for schizophrenia. *Id.* 54. Further, according to Dr. Lucking, "higher education level" is another positive factor that suggests higher functioning, and that "[t]hose who are more impaired, generally do not complete high school, do not complete college." *Id.* 54. The defendant graduated from high school, but he did not attend college. Gov't Ex. 3503 at 3. Dr. Lucking further testified as to several other

factors that suggest a higher level of functioning:  "The presence of negative

symptoms, which consist of difficulty thinking, absence of affect, isolation and

withdrawal, are notoriously unresponsive to treatment.  [The defendant] does not

have any of that."  HT 55.

Third, Dr. Lucking recognized and considered the presence of several

negative or unknown factors identified by Dr. Cervantes on her direct examination

but concluded that these negative factors were outweighed by the positive factors.

For example, as Dr. Lucking noted, "the abrupt onset usually is seen as a positive

factor."  *Id.* 55.  The defendant, however, "appears to have had an onset over a

number of years, so that would be a factor against."  *Id.* 55.  Further, Dr. Lucking

testified that "the onset of psychotic symptoms and the point where he comes for

treatment is longer, the longer that is, the less likely they are to respond.  The

cutoff appears to be about ten years."  *Id.* 55.  Together with the unreliability of the

defendant's self-reported history, this negative factor was one of the primary

concerns expressed by Dr. Cervantes.  However, despite valid points raised by Dr.

Cervantes, the Court agrees with Dr. Lucking that the defendant's  "good outcome

factors . . . are significantly more and they outweigh the bad outcome factors."  *Id.*

55.  Through no fault of Dr. Cervantes, the Federal Bureau of Prisons mental

health professionals' far superior ability to observe the defendant during his

approximately two-and-one-half month in-patient clinical detention at FMC Butner

significantly bolsters the reliability of Dr. Lucking's conclusions regarding the

likelihood of the defendant's restoration compared to Dr. Cervantes' opinion.

Fourth, the Court's conclusion is also strongly influenced by Dr. Lucking's experience in restorations, which, according to his testimony, is better than the results reported in the literature. Specifically, Dr. Lucking testified that he has "treated probably—I would say, roughly a dozen people with delusional disorder. I believe that they have all been returned to competency." *Id.* 62. Dr. Lucking has treated "[m]ost of" these patients "recently since 2006, 2008." *Id.* 75. The Court gives weight to Dr. Lucking's experience and good success in restoring delusional patients, even those not suffering a mixed-type delusional disorder, because it tends to show that Dr. Lucking has, through his experience and judgment, been able to gauge which patients will respond well to medication and which will not. *See United States v. Gomes*, 305 F. Supp. 2d 158, 165-66 (D. Conn. 2004), *aff'd by Gomes*, 387 F.3d 157 (crediting the government's expert's "experience that treatment with [the proposed medication] has improved psychotic disorders and the individual's functioning, and ability to relate to others."); *United States v. Decoteau ("Decoteau II")*, 904 F. Supp. 2d 235, 241 (E.D.N.Y. 2012) (crediting the government's expert, "an experienced BOP professional with direct knowledge of defendant's condition" who "drew on his experience treating patients with psychotic disorders to formulate his opinion").

The Court finds that Dr. Lucking's opinions were not undermined by defendant Baschmann's attempt to impeach Dr. Lucking with testimony Dr.

Lucking gave in a 2004 case, *United States v. Ghane*, 03-CR-00171-KHV (W.D. Mo. Jan. 12, 2004) (Defense Exhibit 1).  In his testimony in *Ghane*, Dr. Lucking stated that "[d]isullusional disorder is difficult to treat and generally responds poorly to treatment with antipsychotic medications, if at all."  Def. Exh. 1, 68 (internal quotation marks omitted).  *See also* HT 60 ("My recollection is[,] I informed the Court that there was approximately a 10 percent response rate to the treatment of delusional disorder with anti-psychotic medicine.").  Dr. Lucking testified that his opinion had changed in the ten years that have passed since *Ghane*, explaining that the literature  "presents a different outlook in terms of treatment and it says that individuals with delusional disorders respond, if adequately treated and well treated, generally respond to treatment, either with resolution of the symptoms or a partial decrease in the symptoms."  *Id.* 61-62.  During the hearing, the Court was persuaded by Dr. Lucking's statements about how and why his considered views have changed in the past ten years.[3]

After careful consideration, in light of the evidence recounted above, the Court finds by clear and convincing evidence that there is a substantial likelihood

---

[3]  Based on Dr. Lucking's testimony in *Ghane*, the Eighth Circuit reversed the district court's conclusion that forced medication was appropriate in light of *Sell*.  *See United States v. Ghane*, 392 F.3d 317 (8th Cir. 2004).  The Eighth Circuit recently affirmed, in part, a district court's *Sell* order in which Dr. Lucking testified after having been cross-examined with his *Ghane* testimony.  *See United States v. Curtis*, 749 F.3d 732 (8th Cir. 2014).  As the district court in that case noted, "[t]he fact that Dr. Lucking's medical opinion about the effectiveness of a certain medication has evolved or changed over time is not necessarily evidence that his later opinion must be wrong or [is] not credible.  Rather, if a medical professional—or a professional in most any field—did *not* allow their opinions or understandings to evolve in light of new evidence or new information, then the professional's credibility and professional integrity would be questionable."  *United States v. Curtis*, 12-CV-20020, 2013 WL 1866930, at *1 (W.D. Ark. May 2, 2013).

that defendant Baschmann will successfully be restored to competency if he is involuntarily medicated in accordance with the treatment plan proposed by Dr. Lucking.  Gov't Ex. 1 at 28-29 (outlining the proposed treatment plan).

### *Unlikelihood of Significant Side Effects.*

*Sell* next requires that the Court consider whether the "administration of the drugs is substantially *unlikely* to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair."  *Sell*, 539 U.S. at 180 (emphasis added).  Dr. Lucking testified that he did "not believe that treatment with the anti-psychotic medication would cause side effects that would impair his ability to participate in the legal process.  In fact, again, I think it would substantially improve his ability to participate."  HT 51-52.  Dr. Lucking recognized that "[s]ome of the side effects" from haloperidol "can be pretty dramatic."  *Id.* 56.  These side effects, which are "neurologic[al] . . . primarily," include dystonic reactions, Parkinson-type reactions, and akathisia.  *Id.* 56.  Dr. Lucking testified that "the literature reports that these neurological side effects occur at the rate of approximately 30 percent and they have a range of severity from mild to severe," but that in his own experience, the side effects "don't occur at the rate of 30 percent.  We see here, I think probably because of the conservative dosage that we use, we see significantly less of these side effects.  They're easily treated."  *Id.* 56-57.  Dr. Lucking then listed the medications he would use to treat haloperidol's possible side effects.  *Id.* 57.

While the Court does not discount the risks of these side effects, the evidence received at the hearing does not undermine the persuasiveness of Dr. Lucking's conclusion that, while potentially severe, the side effects are treatable.

In addition, the Court finds that Dr. Lucking's proposed treatment plan for defendant Baschmann is conservatively designed potentially to determine whether defendant Baschmann will suffer from haloperidol's side effects, before Dr. Lucking will attempt to fully treat the defendant.  Specifically, Dr. Lucking testified that because the defendant "has not been treated, he will require a test dose of the medication to determine if he has any substantial side effects or adverse effects which would prevent us from using this medication. . . .  And if he has a significant adverse reaction, we'd have to try to manage it over the course of a month or so."  *Id.* 49.  *See also* Gov't Ex. 1 at 28-29 (outlining the proposed treatment plan).  Thus, to the extent that any side effects might result from haloperidol, the United States has proposed a plan of treatment intended to identify these side effects early and, if necessary, propose an alternative treatment plan.

Dr. Cervantes testified that the Government's proposed treatment plan still presented risk.  Specifically, Dr. Cervantes testified that "it's not uncommon for people to develop side effects a week or two into treatment or two weeks into treatment," but that "[w]hat [the United States is] proposing is if they don't see any side effects within 24 hours they're going to administer a long-acting medication,

which has the potential to remain in his system for four weeks or longer and hope that there's no side effects that emerge once they've done that."  HT 180-181.

The Court has considered this legitimate concern, however, once again, the Court's conclusion is strongly informed by Dr. Lucking's testimony that, in his experience, "we see significantly less of these side effects," which is "probably because of the conservative dosage that we use."  *Id.*  In light of all the testimony, the Court finds by clear and convincing evidence that the United States' proposed administration of drugs is substantially unlikely to have side effects which will ultimately interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, or that will unfairly influence any jurors' perceptions of the defendant, during his trial.

**C.  The Feasibility of Alternative Treatment.**  The third *Sell* factor asks whether involuntarily medication is "necessary" to further the United States' interests, that is, whether "any alternative, less intrusive treatments are unlikely to achieve substantially the same results."  *Sell*, 539 U.S. at 181.  The Court must also "consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant, backed by the contempt power, before considering more intrusive methods."  *Id.*

Both the United States' and defendant Baschmann's doctors agreed during the hearing that less intrusive means of restoring the defendant's competency, such as psychotherapy, would not be effective in this case.  For

27

example, Dr. Lucking stated that methods other than administering antipsychotic medications might serve as an "adjuncts" to medication, but that non-pharmacological methods have not, by themselves, been found to be effective methods of treating delusional disorder, mixed type.  The primary reason for this, according to Dr. Lucking is that, in general terms, the defendant's illness is a "biological illness requiring a biological treatment."  HT 58.  Similarly, when asked whether "psychotheraphy, education, those sorts of things," would be effective to restore the defendant's competency, Dr. Cervantes replied in the negative.  *Id.* 207.  *See also id.* 184 ("Q:  Would you [Dr. Cervantes] agree with Dr. Lucking that outside of medication there's no alternative treatment that would restore competency?  A: I would agree with that.")

Likewise, the evidence from the hearing establishes that  "a court order to the defendant, backed by the contempt power," *Sell*, 539 U.S. at 181, would be ineffective.  As Dr. Lucking testified, "[t]o try to get [the defendant] involved in psychotherapy would be a monumental task.  First of all, he doesn't believe he has an illness.  He doesn't want treatment.  He doesn't want to tell you stuff.  He is somewhat paranoid.  In fact, he is quite paranoid.  All those factors mitigate against any involvement in psychotherapy."  HT 58.  For these reasons, the Court accordingly finds by clear and convincing evidence that there are no less restrictive means available for restoring the defendant to competence.

**D.  The Medical Propriety of Treatment.**  The final *Sell* factor requires that

the Court  "conclude that administration of the drugs is *medically appropriate, i.e.*,

in the patient's best medical interest in light of his medical condition."  *Sell*, 539

U.S. at 181 (emphasis in original).  Although the Second Circuit did not elaborate

on this *Sell* factor in *Gome*, the Eighth Circuit has noted that *Sell*'s final factor

"requires the district court to consider all of the circumstances relevant to the

particular defendant and to consider the entirety of the consequences of the

proposed involuntary medication."  *United States v. Curtis*, 749 F.3d 732, 737 (8th

Cir. 2014).  *See also United States v. Breedlove*, 765 F.3d 1036, 1043 (7th Cir.

2014) (noting that the fourth *Sell* factor "requires that the district court's finding

recognize the defendant's diagnosis and personal medical history").

At the hearing, Dr. Lucking testified that the proposed treatment would be

medically appropriate for defendant Baschmann, because "psychotic symptoms

are treated with anti-psychotics.  It's very important to treat individuals with

psychosis, particularly schizophrenia and delusional disorder, because psychosis

is a very, very painful experience for an individual to have.  So, when people in the

community see it, they treat them and they recommend the use of anti-psychotic

medication."  HT 59.  By contrast, Dr. Cervantes testified that "[a]t this point, given

the nature of his delusions and the fact that his delusions do not interfere with his

day-to-day functioning or cause him any distress, the risks inherent in him

accepting any kind of treatment and developing any of those side effects, which

could be uncomfortable or dangerous, it would not be in his best interest because he is not distressed." *Id.* 184.  Dr. Cervantes also testified that "[i]n [her] opinion, the delusions do not cause [the defendant] any significant distress; certainly not the grandiose delusions.  He thoroughly seems to enjoy believing the things that he believes.  He's not distressed by this in any way.  Even the persecutory delusions, to the extent that they're bothersome to him is because it relates to this criminal case and because it might have some consequence for him, but primarily, he's functioning quite well, having these beliefs." *Id.* 161.

The Court has carefully considered the opinions of each expert, but the Court is persuaded by Dr. Lucking's testimony as to the medical appropriateness of the proposed treatment regimen.  The Court has considered Dr. Cervantes' testimony about the defendant's subjective sense of his status.  However, when evaluating the final *Sell* factor, which calls for a more holistic assessment of the United States' proposed treatment plan, the Court has also considered Dr. Cervantes' testimony that "if [the defendant] were a patient who walked into [her] office and had the same presentation as [the defendant] d[oes], but I wasn't in a role of a forensic evaluator and I was trying to treat him, I would certainly offer him anti-psychotic medication." *Id.* 186-187.  In light of all the circumstances, the portion of Dr. Cervantes' testimony suggesting that the defendant is in some sense not suffering distress, and is "primarily" well-functioning, does not, in the Court's view, undermine the medical appropriateness of the proposed treatment of

his disorder at FMC Butner.  To the extent that Dr. Cervantes testified that treatment would not be medically appropriate because the defendant is "enjoy[ing]" his delusions, similar considerations have properly been found to be irrelevant to *Sell*'s fourth factor.  *See Breedlove*, *supra* (rejecting an argument that forced medication was "not medically appropriate because it does not consider [the defendant's] individual interests" noting that "this argument directly contradicts *Sell*, which explicitly authorized involuntary medication for the limited purpose of restoring competency").

Further, although Dr. Cervantes identified possible side effects as a reason for her conclusion that proposed medication would not be medically appropriate, Dr. Lucking persuasively testified that, in his experience, the likelihood of side effects was lower, and that any side effects would be treatable.  *See Decoteau I*, 857 F. Supp. 2d at 306 ("The evidence as a whole demonstrates that the risks and severity of the potential side effects are not sufficient to render the proposed treatment medically inappropriate."); *Breedlove*, 765 F.3d at 1043 (rejecting this argument where the risk of side effects "was apparently not significant enough to prevent [the government's experts] from recommending this treatment").

## CONCLUSION

Despite the serious due process concerns posed when medications may be forcibly administered to a pretrial defendant, and despite the absence of any guarantee that the treatment plan prepared by mental-health professionals at FMC Butner will restore the defendant, Robert E. Baschmann, Jr., to sufficient mental competency to stand for trial, the evidence is nevertheless clear and convincing that there is a substantial likelihood of restoring defendant Baschmann to competency without causing side effects prejudicing his ability to receive a fair trial.  The proposed treatment is medically appropriate, and the charges the defendant faces in this case are serious enough to warrant his forced medication.

Accordingly, for all the reasons stated above, the motion of the United States pursuant to 18 U.S.C. § 4241(d), and the four-part test stated by the Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003), to forcibly medicate defendant Baschmann for up to four months to restore him to mental competency for trial is granted.  Dr. Robert G. Lucking, M.D. is authorized to involuntarily medicate the defendant in accordance with the detailed treatment plan set out in Dr. Lucking's report (Gov't Ex. 1 at 28-29) for the purpose of restoring the defendant's competency to stand trial.  FMC Butner mental health staff shall file monthly reports on the defendant's progress so that the parties may move to amend this order if there is a change in relevant circumstances.

Counsel should appear for a status conference January 27, 2015, at 1:00

p.m. To the extent possible, counsel should prepare to report to the Court the status of arrangements for defendant Baschmann to report to FMC Butner or to be transported to FMC Butner.

**SO ORDERED.**

_____*Richard J. Arcara*_____
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:   January 23, 2015